# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN LEE JEREMIAH, | : | CIVIL NO: 1:20-cv-01915 |
| | : | |
| Plaintiff, | : | (Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| | : | |
| WARDEN BRUCE KOVACH, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

The plaintiff, Brian Lee Jeremiah ("Jeremiah"), filed a counseled second amended complaint alleging that Warden Bruce Kovach ("Kovach"), Deputy Warden James Smink ("Smink"), correctional officer Hartman ("Hartman"), correctional officer Sherman ("Sherman"), and four John Doe correctional officers failed to protect him and failed to intervene during an inmate attack at Northumberland County Prison ("Prison"). Jeremiah also alleges that Kovach, Smink, Northumberland County (the "County"), and the Northumberland County Board of Prisons (the "Board") failed to train and supervise the Northumberland County Prison's correctional officers. Additionally, Jeremiah alleges claims regarding intentional infliction of emotional distress and a civil conspiracy to

violate his federal and state civil rights.  Currently pending is a motion to dismiss Jeremiah's second amended complaint.  For the reasons discussed below, we recommend that the motion to dismiss be granted in part and denied in part.

## II. Background.

Jeremiah, a pre-trial detainee, commenced this action on October 16, 2020, by filing a complaint. *Doc. 1*.  On February 26, 2021, Jeremiah filed an amended complaint against Defendants Kovach, Smink, County, Board, Hartman, Sherman, and four John Doe correctional officers. *Doc. 26*.  On May 20, 2021, we granted Jeremiah leave to file a second amended complaint. *Doc. 32*.  On June 7, 2021, Jeremiah filed a second amended complaint against the same defendants. *Doc. 33*.

Jeremiah claims he was an inmate at Northumberland County Prison during the events complained of in his second amended complaint. *Id*. at ¶ 42.  Jeremiah alleges that he and other inmates were transferred to the Northumberland County Prison before it was completed or safe for inmates to inhabit. *Id.* at ¶ 16.  Per Jeremiah, this move was done to save costs and did not consider inmate safety. *Id.* According to Jeremiah, Kovach and Smink knew that the transfer was inappropriate but authorized the transfer of inmates anyway "without regard to or in deliberate indifference to the safety of inmates, including Plaintiff." *Id.* at ¶ 17.

2

Jeremiah claims that Kovach and Smink knew the transfer would agitate other inmates. *Id*. at ¶ 18.  Jeremiah alleges that Kovach and Smink failed to conduct metal health reviews for the transferred inmates. *Id*. at ¶ 19.  Per Jeremiah, Kovach and Smink knew that there was a shortage of correctional officers at the prison and that they were not sufficiently trained. *Id*. at ¶ 22.

On October 18, 2018, while incarcerated at Northumberland County Prison, Jeremiah claims two inmates assaulted him in the inmate shower area. *Id*. at ¶ 49. Jeremiah alleges that the defendants knew that the shower area was an unsafe area and that it required the presence of well-trained correctional officers, which it allegedly did not have during the attack. *Id.* at ¶ 23.  According to Jeremiah, at the time of the assault, he had not yet been adjudicated for a final criminal hearing, as he was awaiting a hearing and/or trial. *Id*. at ¶ 44.   As a result of the assault, Jeremiah claims that the assault resulted in severe disfigurement, including his eyeball being "bludgeoned from his eye socket" and loss of all vision in his right eye. *Id*. at ¶¶ 49, 59.  Per Jeremiah, defendants Hartman, Sherman, and four John Doe correctional officers observed the assault but did not intervene or attempt to stop the assault from occurring. *Id*. at ¶¶ 47, 50.

Jeremiah claims that he did not know the identity of his assailants but that they "were known to Defendants as being violent or physically aggressive inmates

who posed a harm to inmates and/or to Plaintiff on and/or before October 18, 2018." *Id.* at ¶¶ 52, 53.  According to Jeremiah, one of the assailants should not have been present at the prison or should have been separated from Jeremiah. *Id.* at ¶ 54.  Jeremiah alleges that Hartman and Sherman were physically present for the attack but did not intervene. *Id.* at ¶ 55.  Jeremiah claims that the four Doe correctional officers were also physically present for the attack or viewed it via live video surveillance but did not intervene. *Id.* at ¶ 55.

In his second amended complaint, in Count I, Jeremiah claims that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink were deliberately indifferent to Jeremiah's safety and failure to protect him. *Id.* at ¶ 62.  Jeremiah claims that these defendants "knew of and deliberately disregarded the excessive risk of harm to the Plaintiff's health and safety posed by the inmate assault" because they did not intervene during the assault. *Id.*  Specifically, Jeremiah claims that Kovach and Smink "failed to properly classify and segregate the assailant inmates, through their classification policies and procedures, who Defendants Kovach and Smink knew posed an imminent danger to the Plaintiff." *Id.* at ¶ 63.

In Count II, Jeremiah alleges that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink failed to intervene on behalf of Jeremiah, "whose constitutional rights were being violated in their presence while Plaintiff

4

was being assaulted by another inmate." *Id*. at ¶ 68.  Per Jeremiah, the defendants'
failure to intervene and stop the assault resulted in severe physical injuries to
Jeremiah. *Id*. at ¶ 74.

In Count III, Jeremiah alleges that Kovach, Smink, the County, and the
Board failed to train and supervise the prison's correctional officers. *Id*. at ¶¶ 76,
79.  Regarding Kovach and Smink, Jeremiah claims that they "failed to discipline,
train or otherwise sanction correctional officers who violate the rights of prisoners
by failing to intervene and protect inmates, including the Plaintiff's." *Id*. at ¶ 76.
According to Jeremiah, the failure to train resulted in Hartman, Sherman, and the
four Doe correctional officers from failing to intervene and protect him from the
assault. *Id*. at ¶¶ 76, 77.  Jeremiah further alleges that Kovach and Smink failed to
properly train correctional officers regarding the classification of inmates. *Id*. at ¶
77.  Jeremiah claims that Hartman, Sherman, and the four Doe correctional officers
acted as agents of the County and the Board, which makes the County and Board
responsible for their actions. *Id*. at ¶ 78.

Per Jeremiah, the County and Board were on notice of a need to train the
prison staff as "prior to the incident in question [*sic*] as other similar incidents of
being deliberately indifferent to inmate[-]on[-]inmate assaults have occurred in the
past involving Defendants in their failing to properly classify inmates and protect

5

them from other inmate assaults." *Id*. at ¶ 79.  Jeremiah claims that inmate assaults are rampant at the prison. *Id*. at ¶ 80.  Jeremiah alleges that Tara Lea Johnson, a former Northumberland County Jail employee, witnessed videos of Hartman, Sherman, and unknown correctional officers deliberately failing to intervene in several inmate assaults. *Id*.

In Count IV, Jeremiah alleges that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink intentionally and deliberately inflicted emotional distress on Jeremiah by allowing him to be assaulted. *Id*. at ¶ 83. Specifically, Jeremiah claims that the conduct of Hartman, Sherman, and the four Doe correctional officers was outrageous and extreme because they allowed the two inmates to assault Jeremiah brutally. *Id*. at ¶ 84.  Additionally, Jeremiah alleges that Kovach and Smink's conduct was also outrageous and extreme because they failed to properly classify prisoners, which resulted in Jeremiah being assaulted. *Id*. at ¶ 85.

In Count V, Jeremiah claims that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink conspired to violate Jeremiah's federal and state civil rights. *Id*. at ¶ 90.  Per Jeremiah, the defendants "knew that numerous inmate assaults were occurring in the prison and had all seen numerous videos of inmate assaults together in conferences, staff meetings and conversation

6

but chose to deliberately and recklessly ignore the inmate violence which occurred on a daily basis." *Id*. at ¶ 91.  According to Jeremiah, Kovach and Smink chose to ignore the daily occurrences of inmate violence and crafted a policy that "made reckless indifference to inmate assaults ubiquitous." *Id*. at ¶ 92.  Regarding Hartman, Sherman, and the four Doe correctional officers, Jeremiah claims that they verbally conspired to watch the assault and encouraged the assault, and/or did nothing to prevent the assault from occurring. *Id*. at ¶ 93.

For relief, Jeremiah "demands judgment against Hartman, Sherman, Kovach, Smink and unknown correctional officers, individually, jointly and/or in the alternative for: compensatory damages, punitive damages, attorney fees, interest and costs of suit and such relief as the Court may deem just and equitable." *Id*. at ¶ 99.  Additionally, Jeremiah demands "judgment against Northumberland County, individually, jointly and/or in the alternative for: compensatory damages, attorney fees, interest and costs of suit and such relief as the Court may deem just and equitable." *Id*. at ¶ 100.  Currently pending is the defendants' motion to dismiss the second amended complaint, which has been fully briefed. *See Docs. 34*, *35*, and *37*.  For the reasons discussed below, we recommend that the motion to dismiss be granted and denied in part.

7

### III.   Pleading and Motion-to-Dismiss Standards.

In accordance with Fed. R. Civ. P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F.Supp.2d 762, 769–70 (M.D. Pa. 2012).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  The statement required by Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S.

89, 93 (2007).  Detailed factual allegations are not required, but more is required than "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has to 'show' such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court "'must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.'" *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)).  But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).  A court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

## IV.    42 U.S.C. § 1983.

To state a viable Section 1983 claim, a plaintiff must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003). Moreover, for a Section 1983 claim to survive a motion to dismiss, the plaintiff must sufficiently allege that the defendant was personally involved in the act or acts that the plaintiff claims violated his rights. *Rode v. Dellarciprete*, 845 F.2d

10

1195, 1207 (3d Cir. 1988); *see also Chavarria v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

Individual liability can be imposed under 42 U.S.C. § 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode*, 845 F.2d at 1207); *Sutton v. Rasheed*, 323 F.3d 236, 249-50 (3d Cir. 2003). The personal involvement of a defendant in a Section 1983 action may be shown "through allegations of personal direction or of actual knowledge and acquiescence." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 71 (3d Cir. 2011) (quoting *Rode*, 845 F.2d at 1207). Such allegations, however, must be made with appropriate particularity in that a complaint must allege the particulars of "conduct, time, place, and persons responsible." *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08.

Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208. Moreover, a defendant "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *C.H. ex rel. Z.H. v. Olivia*, 226 F.3d 198, 201-02 (3d

11

Cir. 2000).  Allegations that a supervisor "had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor" do not suffice. *Broadwater v. Fow*, 945 F.Supp. 574, 588 (M.D. Pa. 2013) (citing *C.H. ex rel. Z.H.*, 226 F.3d at 202).


### V. Individual and Official Capacity Claims.

Before we begin our discussion of Jeremiah's claims, we note that there appears to be some uncertainty about whether the defendants are being sued in their official capacities, individual capacities, or both their official and individual capacities.  For example, in the caption of Jeremiah's second amended complaint, he names Kovach and Smink in their official capacities as Warden and Deputy Warden of Northumberland County Prison. *Doc. 33* at 1.  But throughout his second amended complaint, Jeremiah alleges facts that indicate he is attempting to sue Kovach and Smink in their individual capacities.  Moreover, based on the defendants' arguments in their brief in support of their motion to dismiss, they ostensibly construe Jeremiah's claims against Kovach and Smink in their individual capacities and do not address the official capacity designations.

When there is ambiguity as to whether a party is being sued in their official or individual capacity, "[c]ourts in the Third Circuit look to the complaint and the

12

course of proceedings to determine whether [an] official is being sued in their individual capacity, official capacity, or both." *Day v. New Jersey Dep't of Corr.*, No. 21-cv-09986, 2022 WL 170855, at *5 (D.N.J. Jan. 19, 2022) (citing *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990) (internal quotations omitted)); *see also Loomis v. Montrose Borough Police Dep't.*, No. 3:20-cv-1610, 2021 WL 2865290, n.1 (M.D. Pa. July 8, 2021) ("The complaint does not specify whether Loomis is asserting an individual-capacity or official-capacity claim against Officer Diddick. Based on Loomis's complaint, and the parties' invocation of individual- and official-capacity related doctrines, we construe the complaint as asserting both types of claims."). Thus, considering the official-capacity designations in Jeremiah's second amended complaint caption, the allegations regarding individual responsibility, and defendants' response, we construe Jeremiah as alleging individual capacity claims against Kovach and Smink in Counts I and II for failure to protect and failure to intervene, but alleging both individual and official capacity claims in County III for failure to train and supervise.

Moreover, "because official capacity claims against an individual defendant are duplicative of claims brought against a municipality, 'courts sitting in the Third Circuit have dismissed defendants sued in their official capacity when the same claims are made against the municipality.'" *Rankin v. Majikes*, No. 3:cv-14-699,

13

2014 WL 6893693, at *6 (M.D. Pa. Dec. 5, 2014) (quoting *Dubas v. Olyphant Police Dep't*, No. 3:11-cv-1402, 2012 WL 1378694, at *4 (M.D. Pa. Apr. 20, 2012)).  "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell, supra,* local government units can be sued directly for damages and injunctive or declaratory relief." *Id.* at 167 n.14.

Here, in Count III Jeremiah's official-capacity claims against Kovach and Smink are duplicative of claims brought against the County.  We, therefore, recommend dismissing Count III against Kovach and Smink in their official capacities.  *See Whitehurst v. Lackawanna Cty.*, No. 3:17-cv-00903, 2020 WL 6106616, at *7 (M.D. Pa. Mar. 5, 2020) (recommending that claims against county defendants in their official capacities be dismissed as redundant "pursuant to the Court's inherent authority to control its docket and avoid duplicative claims" where county is also named as a defendant), *report and recommendation adopted*, 2020 WL 6083409 (M.D. Pa. Oct. 15, 2020).  Moreover, because Jeremiah refers to Count III as a failure to train and supervise claim under *Monell*, we will not construe Count III as a claim against Kovach and Smink in their individual capacities.

As we construe all other claims to be brought against the defendants in their individual capacities,[1] we recommend that the Count III claims against Kovach and Smink in their official capacities be dismissed against them entirely as they are duplicative of the claims against the County.

## VI.    Discussion.

### A. Failure to Protect Claim.

In Count I of his second amended complaint, Jeremiah alleges that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink failed to protect him from a prison assault.  Since Jeremiah alleges that he was a pretrial detainee, rather than a convicted prisoner, at time of the incident, the Due Process Clause, rather than the Eighth Amendment, applies to his failure to protect claim. *Boring v.*

---

[1] We do not construe Jeremiah's conspiracy claim against Kovach and Smink, or any of the defendants for that matter, as an official-capacity claim. Regardless, such a claim cannot survive due to the intra-corporate conspiracy doctrine. *See Shingara v. Skiles*, 274 Fed. App'x 164, 168 (3d Cir. 2008) "([T]he intra[-]corporate conspiracy doctrine applies to claims of federal civil rights conspiracy.").  "Under this doctrine, because all of the Defendants are agents of the DOC, Defendants cannot be liable for civil conspiracy as a single entity cannot conspire with itself … [t]hus, Defendants' Partial Motion to Dismiss should be granted as to Plaintiff's conspiracy claim against Defendants in their official capacity." *Walker v. Campbell*, 2010 WL 2891488, No. 09-cv-282, *7 (W.D. Pa. May 4, 2010).

*Kozakiewicz,* 833 F.2d 468, 471 (3d Cir. 1987) ("Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause.").

The Third Circuit has held "a pretrial detainee presenting a failure-to-protect claim must plead that the prison official acted with deliberate indifference to the detainee's health or safety." *Burton v. Kindle*, 401 Fed.Appx. 635, 638 (3d Cir. 2010). In *Burton*, the Third Circuit adopted the deliberate indifference standard applied to Eighth Amendment claims. *Id*. at 637. Under the Eighth Amendment, prison officials "must 'take reasonable measures to guarantee the safety of . . . inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, prisoners have "a clearly established constitutional right to have prison officials protect [them] from inmate violence." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (footnote omitted), *abrogated on other grounds by Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018).

But "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the

16

victim's safety." *Farmer*, 511 U.S. at 834.  Rather, in addition to causation, "[f]or an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). "First, the prisoner must demonstrate 'that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Id*. (quoting *Farmer*, 511 U.S. at 834). "This element is satisfied when the alleged 'punishment' is 'objectively sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834).  "Second, the prison officials involved must have a sufficiently culpable state of mind." *Id*.  They must have been deliberately indifferent to a substantial risk to the inmate's health and safety. *Bistrian*, 696 F.3d at 367.  "Specifically, the inmate must show that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Hamilton*, 117 F.3d at 746 (quoting *Farmer*, 511 U.S. at 837).

"A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety 'in the usual ways, including inference from circumstantial evidence.'" *Bistrian*, 696 F.3d at 367 (quoting *Farmer*, 511 U.S. at 842).  But "[p]rison official may escape liability for deliberate indifference claims in several ways. They 'might show … that they did not know of the underlying

facts indicating a sufficiently substantial danger … or that they knew the underlying facts but believed … that the risk … was insubstantial or nonexistent." *Bistrian*, 696 F.3d at 367 (quoting *Farmer*, 511 U.S. at 844).  Furthermore, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*  For the third and final prong of a failure to protect claim, the prisoner must then show that "the official's deliberate indifference caused him harm." *Bistrian*, 696 F.3d at 367 (citing *Farmer*, 511 U.S. at 834).

Here, Jeremiah alleges sufficient facts to establish a failure to protect claim against Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers. To state a failure to protect claim, Jeremiah must first allege that he was at a substantial risk of serious harm.  Per Jeremiah's second amended complaint, he was violently attacked by two other inmates at the Northumberland County Prison and suffered severe injuries as a result of the attack.  Courts within the Third Circuit have routinely held that a plaintiff satisfies the substantial risk of serious harm prong if they allege that they were the victim of a prison attack. *See McGlinchey v. Lane*, No. 2:18-cv-0014, 2020 WL 2513536, at *2 (W.D. Pa. 2020) (finding that, at the motion to dismiss stage, a prisoner plaintiff satisfies the substantial risk of harm prong because the defendant Superintendent and

18

correctional officers did not dispute that the attack occurred.) ("[t]he Court finds that Plaintiff has satisfied the first prong of the inquiry. Defendants do not dispute that Plaintiff was the victim of a violent attack by his cellmate. The allegations of the TAC sufficiently plead that Plaintiff was put at substantial risk of serious harm."); *see also Scott v. Clark*, No. 1:19-cv-00169, 2020 WL 4905624, at *4 (W.D. Pa. July 28, 2020) ("[i]ndeed, the DOC Defendants do not dispute that Scott was the victim of a violent attack by another inmate. And his injuries, as alleged, were serious. Thus, the allegations of the Amended Complaint sufficiently plead that Scott was put at substantial risk of serious harm."). Here, the defendants do not dispute that Jeremiah was the victim of a prison assault. Thus, we find that Jeremiah has satisfied the substantial risk of harm prong of his failure to protect claim.

As to whether the defendants were deliberately indifferent to such substantial risk of harm, Jeremiah alleges that there is a longstanding history of inmate attacks at Northumberland County Prison. Indeed, Jeremiah claims that Tara Lea Johnson, a former Northumberland County Jail employee, witnessed videos of Hartman, Sherman, and unknown correctional officers deliberately failing to intervene in several inmate assaults. *Doc. 33* at ¶ 80. Also, Jeremiah specifically alleges that the two inmates who attacked him were known to be

19

violent individuals and that the defendants knew they posed a threat to Jeremiah.
*Id.* at ¶ 53.

Defendants argue that Jeremiah fails to allege any personal involvement from Kovach and Smink regarding the attack.  Defendants also argue that Jeremiah does not provide sufficient allegations about how the attack came about, or what Hartman and Sherman did during the attack.  Even so, courts within the Third Circuit have found:

> [T]he United States Supreme Court held in *Farmer* that an inmate could demonstrate deliberate indifference not only by showing that prison officials failed to respond to a particularized threat to the complaining plaintiff, but also 'by showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk.'

*McGlinchey*, 2020 WL 2513536, at *2 (quoting *Farmer*, 511 U.S. at 842).

Here, Jeremiah alleges sufficient facts that Kovach and Smink were aware that Northumberland County prison experienced frequent inmate on inmate attacks and that Jeremiah was at risk for such an attack.  Jeremiah alleges that Kovach and Smink "failed to properly classify and segregate the assailant inmates, through their classification policies and procedures, who Defendants Kovach and Smink knew posed an imminent danger to the Plaintiff." *Doc. 33* at ¶ 63.  Jeremiah also

20

alleges that Kovach and Smink knew that inmates would be agitated by the transfer to Northumberland County Prison, that there was a shortage of properly trained correctional officers, and that the shower area was unsafe for inmates. *Id*. at ¶¶ 17, 18, 21, 22, and 23.  In the light most favorable to Jeremiah, we conclude that he alleges sufficient facts that Kovach and Smink were aware of the dangers he faced and were thus deliberately indifferent to that risk.

Regarding Hartman, Sherman, and the four Doe correctional officers, Jeremiah has also alleged sufficient facts that they were deliberately indifferent to the harm he faced at Northumberland County Prison.  Indeed, Jeremiah specifically alleges that Hartman, Sherman, and four Doe correctional officers were present during the attack and did not act to intervene or protect Jeremiah. *Doc. 33* at ¶ 50. Jeremiah alleges that Hartman, Sherman, and the four Doe correctional officers watched the assault and "either encouraged the beating of Plaintiff, and/or did nothing to prevent, protect or intervene in the attack and assault of the Plaintiff." *Id*. at ¶ 57.  Jeremiah further alleges that Hartman, Sherman, and the four Doe correctional officers knew "that allowing Plaintiff to shower with the inmate assailants would cause Plaintiff to be viciously assaulted." *Id*. at ¶ 64.

Defendants argue that Jeremiah does not provide sufficient facts regarding Hartman and Sherman's ability to prevent the attack.  The Third Circuit, however,

has held that "if an officer witnesses an inmate assault and fails to intervene, 'his actions would seemingly constitute a paradigm case of deliberate indifference.'" *Bistrian*, 696 F.3d at 371 (quoting *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008)).  In *Bistrian*, the Third Circuit stated "[n]o doubt, there are some circumstances in which an officer's response to an inmate attack is so half-hearted that it effectively amounts to no response at all. If well-pled, such a claim can survive a motion to dismiss." *Bistrian*, 696 F.3d at 371."  Here, Jeremiah does not allege that Hartman, Sherman, and the four Doe correctional officers made half-hearted attempts to stop the attack; rather, he asserts that they either encouraged it or did nothing to stop it.  Construing these allegations as true, Jeremiah alleges sufficient facts that satisfy the deliberate indifferent standards articulated in *Bistrian* and establishes a claim that Hartman, Sherman, and the four Doe correctional officers acted with deliberate indifference.

Construed in the light most favorable to Jeremiah, we conclude that Jeremiah alleges sufficient facts that the Count I defendants were aware of the longstanding risk of harm at Northumberland County Prison, that they were aware of the dangers he faced, and they were deliberately indifferent to that danger. Accordingly, we find that Jeremiah has satisfied the deliberate indifference prong against the defendants.

22

As to whether the defendants' deliberate indifference caused Jeremiah harm, we find that Jeremiah alleges sufficient facts that Kovach, Smink, Hartman, Sherman, and the four Doe correctional officer's deliberate indifference caused him harm. It is sufficient that Jeremiah alleges he suffered at least some harm due to the defendants' deliberate indifference. *See Travillion v. Wetzel*, 765 Fed.Appx. 785, 795 (3d Cir. 2019) (finding that the plaintiff satisfied the causation prong by alleging the official's deliberate indifference resulted in some harm to the plaintiff). Here, Jeremiah alleges that the defendants' deliberate indifference caused an inmate attack that resulted in his eye being bludgeoned from his eye socket, blindness, and disfigurement. *See Doc. 33* at ¶ 49, 50, and 71. Jeremiah, therefore, alleges sufficient facts to satisfy the causation prong against Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers. Accordingly, we find that Jeremiah alleges sufficient facts to establish a failure to protect claim, and we recommend denying the motion to dismiss Count I.

### B. Failure to Intervene claim.

In Count II of his second amended complaint, Jeremiah alleges that Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers failed to intervene on his behalf during the assault. "Corrections officers can be liable for

failing to intervene when a constitutional violation takes place in their presence or within their knowledge and they have a 'realistic and reasonable opportunity to intervene.'" *Gilmore v. Lamas*, No. 19-cv-5571, 2021 WL 5882093, at *5 (E.D. Pa. Dec. 10, 2021) (quoting *Smith v. Mensinger*, 293 F.3d 641, 650-651 (3d Cir. 2002)).  "As pretrial detainees enjoy even more protection under the Fourteenth Amendment than convicted prisoners do under the Eighth Amendment, the same duty to intervene applies with regard to pretrial detainees as well." *Sanders v. Rose*, No. 1:10-cv-01241, 2016 WL 466507, at *7 (M.D. Pa. Feb. 8, 2016) (citing *Bistrian*, 696 F.3d at 371).

Jeremiah alleges that Hartman, Sherman, and the four Doe correctional officers all witnessed the attack and either encouraged or did nothing to stop it from occurring. *Doc. 33* at ¶ 69.  Construing these allegations as true, we conclude that Jeremiah alleges a plausible failure to intervene claim against Hartman, Sherman, and the four Doe correctional officers. *See Abney v. Younker*, No. 1:13-cv-1418, 2019 WL 7812383, at *6 (M.D. Pa. Oct. 3, 2019) ("[c]ourts have held correctional officers liable for a failure to intervene when such officers were present at the time of the attack and did not intervene, stop, or report the incident."); *see also Belt v. Federal Bureau of Prisons,* 336 F.Supp.3d 428, 439 (D.N.J. 2018) (finding that a failure to protect claim was established when the

24

plaintiff alleged that a correctional officer witnessed a sexual assault and did not intervene).

Regarding Kovach and Smink, Jeremiah does not allege that they were present for the attack.  Instead, Jeremiah alleges that Kovach and Smink "deliberately or recklessly failed to properly have procedures to classify and segregate the assailant inmates who the Defendants knew posed an immediate danger to the Plaintiff and ultimately caused plaintiff to have his right eye become fully detached from his eye socket because of his assault." *Doc. 33* at ¶ 71.

A supervisor is liable under § 1983 "if he or she implements a policy or practice that creates an unreasonable risk that a subordinate will perpetrate a constitutional violation, provided that the supervisor's failure to change the policy or employ corrective practices actually causes the subordinate to violate a person's constitutional rights." *Douglas v. Brookville Area Sch. Dist.*, 836 F.Supp.2d 329, 354-55 (W.D. Pa. 2011) (internal quotations omitted) (citing *Argueta*, 643 F.3d at 72).  To hold a supervisor liable because his or her policies or practices led to a constitutional violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and must allege facts from which it can reasonably be inferred that: (1) the existing policy or practice created an unreasonable risk of constitutional injury; (2) the supervisor was aware of that risk; (3) the supervisor

was deliberately indifferent to that risk; and (4) constitutional injury resulted from the policy or practice. *Beers–Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001).

Here, Jeremiah claims that Kovach and Smink failed to employ a policy of classifying and segregating inmates based on violent tendencies. Jeremiah alleges that this failure to classify and segregate inmates created an unreasonable risk of constitutional injury because Kovach and Smink knew that failing to classify and segregate the assailant inmates posed an immediate danger to him. Per Jeremiah, Kovach and Smink were deliberately indifferent to this risk because they failed to classify and segregate the assailant inmates, and as a result of this failure, Jeremiah suffered severe injuries from the assailant inmates. Thus, Jeremiah alleges sufficient facts to satisfy the *Beers-Capitol* test, and he, therefore, alleges sufficient facts to establish a failure to intervene claim against Kovach and Smink. Accordingly, we recommend denying the motion to dismiss Count II.

## C. Qualified Immunity.

Defendants argue that Hartman, Sherman, Kovach, and Smink are entitled to qualified immunity as to Counts I and II. Despite their participation in constitutionally impermissible conduct, government officials, such as those named here, "may nevertheless be shielded from liability for civil damages if their actions

26

did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. In other words, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *Id*. at 589–90

(internal citations omitted).  "It is not enough that the rule is suggested by then-existing precedent." *Id*. at 590.  Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*.  Still, "the facts of the existing precedent need not perfectly match the circumstances of the dispute in which the question arises." *Williams v. Secretary PA Dept. of Corrections*, 848 F.3d 549, 570 (3d Cir. 2017).  But if the law did not put the officer on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson,* 555 U.S. at 236.  Thus, the court

28

may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*  In fact, the Supreme Court has stressed "that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) (quoting *Camreta v. Greene,* 563 U.S. 692, 707 (2011)).

"While it is true that qualified immunity should be resolved at the earliest possible stage of litigation, *see Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), at the motion to dismiss stage, 'qualified immunity will be found only when the immunity is established on the face of the complaint.'" *O'Donnell v. Cumberland Cty.*, 195 F.Supp.3d 724, 734–35 (M.D. Pa. 2016) (quoting *Schor v. North Braddock Borough*, 801 F.Supp.2d 369, 378–79 (W.D. Pa. 2011) (citing *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir.2006)). "Thus, only where a plaintiff 'fails to state a claim of a violation of a clearly established law, [is] a defendant pleading qualified immunity . . . entitled to dismissal before the commencement of discovery.'" *Id.* (quoting *Schor*, 801 F.Supp.2d at 379).  Additionally, the Third Circuit has stated, "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is

29

necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 Fed. App'x 788, 791 n.3 (3d Cir. 2009) (per curiam).

Here, defendants argue that qualified immunity applies to Hartman and Sherman because "the law is not clearly established that failing to intervene in an inmate upon inmate assault, not otherwise factually described in the Second Amended Complaint was unlawful." *Doc. 35* at 8. Defendants also argue that qualified immunity applies to Kovach and Smink because "the law was not clearly established that merely serving as Wardens for the prison was unlawful." *Id*. As we previously discussed, Jeremiah alleges sufficient facts to state constitutional violation claims against Kovach, Smink, Hartman, and Sherman due to their alleged failure to protect and intervene in the assault. Given this, we cannot find at this early stage that these defendants are entitled to qualified immunity on the face of the second amended complaint alone and recommend that the motion to dismiss be denied on the basis of qualified immunity.

### D. Failure to Train/Supervise Claim Under *Monell*.

In Count III of his second amended complaint, Jeremiah alleges that Kovach, Smink, the County, and the Board failed to properly train and supervise the Northumberland County Prison staff. Jeremiah claims that Kovach and Smink

failed to "train or otherwise sanction correctional officers who violate the rights of prisoners by failing to intervene and protect inmates, including the Plaintiff's, thus encouraging Defendants unknown correctional officers, in this case to engage in the unlawful and actional conduct." *Doc. 33* at ¶ 76.  Jeremiah further alleges that Kovach and Smink failed to properly train its correctional officers "in the classification of inmates and the intervention to protect inmates from assaults." *Id.* at ¶ 77.  Per Jeremiah, Hartman, Sherman, and the four Doe correctional officers acted as agents of the County and the Board. *Id.* at ¶ 78.[2]  Before we begin our discussion of Jeremiah's claims, we note a few relevant standards.

"When execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury … the government as an entity is responsible under § 1983." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  For a government entity to be liable under § 1983 for an unconstitutional policy or custom, "the plaintiff must identify a policy or custom of the entity that caused the constitutional violation." *Id.* (citing *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004)); *see also Fetters v. Mearkle*, No.

---

[2] Since Jeremiah labels this claim as a *Monell* claim, we do not construe Count III as alleging any individual capacity claims.

1:15-cv-1935, 2016 WL 11586601, at *5 (W.D. Pa. Jan. 11, 2016); *see also Estate of Roman v. City of Newark,* 914 F.3d 789, 798 (3d Cir. 2019).

A municipality, such as the County, cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior. *Monell*, 436 U.S. at 691.  Rather, "under § 1983, local governments are responsible only for 'their own illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)). "The pleading requirements are different for failure-to-train claims because a plaintiff need not allege an unconstitutional policy." *Estate of Roman*, 914 F.3d at 798) (citing *Reitz v. Count of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)).  Rather, he or she must show that the municipality's failure to train, supervise, or discipline "its employees 'reflects a deliberate or conscious choice.'" *Id*. (*quoting Brown v. Muhlenberg Twp*., 269 F.3d 205, 215 (3d Cir. 2001)).  In this regard, the plaintiff must show "a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).  "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id*.

32

In limited circumstances, a municipality's decision not to train its employees about their duty to avoid violating citizens' rights may rise to the level of a constitutional violation. *Connick*, 563 U.S.at 61. "The alleged deficiency in a training program must be closely related to the alleged constitutional injury because '"[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, [said] plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.'" *Forrest*, 930 F.3d at 109 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989)). Thus, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

"To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id*. (quoting *Canton*, 489 U.S. at 388). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id*. (quoting *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). "'Ordinarily, this requires a plaintiff to identify a 'pattern of similar constitutional violations by untrained employees' that 'puts municipal decisionmakers on notice that a new program is necessary . . . .'"

33

*Johnson v. City of Philadelphia*, No. 19-2938, 2020 WL 5638661, at *7 (3d Cir. Sept. 22, 2020) (quoting *Thomas v. Cumberland Cty*., 749 F.3d 217, 223 (3d Cir. 2014)). "Otherwise, the plaintiff needs to show that failure to provide the identified training would 'likely . . . result in the violation of constitutional rights'—i.e., to show that 'the need for more or different training [was] so obvious.'" *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Defendants argue that the Board is not a proper party because it is not a legal entity separate and apart from the County. *See Smith v. First Judicial Dist*., No. 04-cv-5636, 2005 U.S. Dist. LEXIS 10211, at *6-7 (E.D. Pa. May 25, 2005). "Although two [W]estern [D]istrict cases held that a prison board does not have the capacity to be sued … this has not been the position of the Middle District, Eastern District or the Third Circuit." *Goodine v. Lackawanna County Sherrif*, No. 4:08-cv-01898, 2010 WL 830956, at *5 (M.D. Pa. Mar. 4, 2010) (citing *Birckbichler v. Butler County Prison*, No. 07-cv-1655, 2009 U.S. Dist. LEXIS 84949 at *18-19 (W.D. Pa. Sept. 17, 2009)); *Brothers v. Larence County Prison Bd*., No. 06-cv-1285, 2008 U.S. Dist. LEXIS 2487, at *2 (W.D. Pa. Jan. 14, 2008).  Indeed, this court has consistently held that county prison boards are amenable to suit under § 1983. *See Goodine*, 2010 WL 830956, at *5 ("[a] county prison board is a local government unit and a person amenable to suit under § 1983") (quotations

omitted); *see also Meyers v. Schuylkill County Prison*, No. 4:04-cv-1123, 2006 WL 559467, at *9 (M.D. Pa. Mar. 7, 2006) (finding that the Schuylkill County Prison Board is an arm of Schuylkill County and is subject to liability for violations of § 1983).

Here, we follow the position of our own court and find that the Board is a proper party amenable to suit in this action.  Jeremiah, however, fails to allege sufficient facts regarding a Board policy or custom and that the policy or custom caused the constitutional violation he alleges. *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003).  Instead, Jeremiah claims that Kovach and Smink failed to discipline, train, or sanction correctional officers who violated inmates' rights.  He further alleges that Kovach and Smink failed to properly train the correctional officers in the classification of inmates and the intervention to protect inmates from assaults.  Indeed, the only mention of the Board is that it, along with the County, was on notice of a need to train, supervise, and discipline the correctional officers and that it was on notice of the rampant assaults at Northumberland County Prison.  Jeremiah alleges no Board policy or custom that caused the constitutional violation he alleges.  We, therefore, recommend dismissing Count III against the Board.

Regarding the County, Jeremiah alleges sufficient facts to establish a failure to train and supervise claim against the County arising from the inaction of its correctional officers.  We previously noted that Jeremiah has adequately plead plausible constitutional violations of Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers based on their alleged failure to protect and intervene.  Jeremiah alleges that the County has maintained a longstanding custom of inadequately training, supervising, and disciplining the staff at Northumberland County Prison, resulting in correctional officers frequently failing to intervene and protect inmates during attacks.  Specifically, Jeremiah claims that Kovach and Smink developed a custom of not adequately training correctional officers on classifying inmates and how to intervene and protect inmates from assaults.

Jeremiah further alleges that the County is aware of the need to train, supervise, and discipline its correctional officers based on how rampant inmate assaults are at Northumberland County Prison.  Moreover, Jeremiah claims that despite being aware of these alleged training deficiencies, the County has not only ignored the issues but has exacerbated them by improperly transferring inmates to the prison to save money.  Based on these allegations, Jeremiah has sufficiently identified a County custom and alleged that it resulted in a violation of his constitutional rights.  Jeremiah also claims that the County is deliberately

36

indifferent to this deficiency, as they are allegedly aware of the rampant incidents of inmate assaults at Northumberland County Prison.  Construing these allegations as true, Jeremiah has established a failure to train and failure to supervise claim against the County. *See McPherson v. Cty. Of Dauphin*, No. 1:19-cv-01865, 2020 WL 1558206, *5 (M.D. Pa. Mar. 24, 2020) (denying the defendant County's motion to dismiss on a failure to train claim).  Accordingly, we recommend that Count III of the second amended complaint not be dismissed against the County.

### E. Intentional Infliction of Emotional Distress Claim.

In Count IV of his second amended complaint, Jeremiah claims that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink intentionally inflicted emotional distress onto Jeremiah.  "While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, *see Taylor v. Albert Einstein Med. Ctr*., 754 A.2d 650, 652 (2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, 'in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff.'" *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d

1228, 1230 (Pa.Super.Ct. 2005).  To establish a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) defendant's conduct was intentional or reckless; (2) defendant's conduct was extreme and outrageous; (3) defendant's conduct caused emotional distress; and (4) the resultant emotional distress was severe." *Watson v. Witmer*, 183 F.Supp.3d 607, 617 (M.D. Pa. 2016).

To be actionable as intentional infliction of emotional distress, the "conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa.Super.Ct. 1987)).  "Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct." *Id*. (citing for example *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing the plaintiff's son with an automobile and failing to notify authorities or seek medical assistance, buried the body in a field where it was discovered two months later and returned to the parents); *Banyas v. Lower Bucks Hosp*., 437 A.2d 1236 (Pa.Super.Ct. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a

38

third party, which led to the plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that the plaintiff was suffering from a fatal disease when physician knew such information was false)).  Recovery for the tort of intentional infliction of emotional distress is reserved for "only the most clearly desperate and ultra extreme conduct." *Id.* at 754.  The conduct "must be such that 'the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!'" *L.H. v. Pittston Area Sch. Dist.*, 130 F.Supp.3d 918, 927 (M.D. Pa. 2015) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa.Super.Ct. 1997) (internal quotations removed)).  "It is for this court to decide as an initial matter whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *L.H.*, 130 F.Supp.3d at 927-28.

Here, the defendants move to dismiss the intentional infliction of emotional distress claim contending that they are barred by Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S.A. § 8541, *et seq.*  The PSTCA provides that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other

person." 42 Pa. C. S. A. § 8541.  The PSTCA enumerates nine exceptions to a local agency's immunity for specific negligent acts. 42 Pa.C.S.A. § 8542. Employees of local agencies are generally immune from liability to the same extent as their employing agency providing they were acting within the scope of their employment. 42 Pa. C. S. A. § 8545.  But immunity under the PSTCA does not apply when the act of the employee that caused the injury "constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. C. S. A. § 8550.

The defendants argue that Jeremiah fails to allege facts that would satisfy any exception to the PSTCA.  Specifically, the defendants contend that Jeremiah only alleges that the defendants failed to act, which they argue is insufficient to establish an intentional infliction of emotional distress claim.  In support, the defendants cite to *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist. See M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist*., 43 F.Supp.3d 412, 431 (M.D. Pa. 2014) (citing *Jackson v. Sun Oil Co*., 521 A.2d 469, 471 (1987) ("[t]here is no liability pursuant to Section 46 for the mere negligent infliction of emotional distress.")).

While it is true that Jeremiah's allegations are that the defendants failed to act, a defendant's failure to act can establish an intentional infliction of emotional distress claim. *See Martin-McFarlane v. City of Philadelphia*, 299 F.Supp.3d 658, 671-672 (E.D. Pa. 2017) (finding that a plaintiff's allegations that correctional

officers left the plaintiff alone with a known dangerous individual and a resulting attack occurred was sufficient to establish an intentional infliction of emotional distress against the defendant correction officers and City of Philadelphia); *see also Thompson v. United States*, No. 16-cv-3287, 2017 WL 2972679, at *3-4 (E.D. Pa. July 12, 2017) (finding that a prison's failure to respond to a plaintiff's medical needs established an intentional infliction of emotional distress claim); *see also Pierce v. Penman*, 515 A.2d 948 (Pa. Super. Ct. 1986) (finding intentional infliction of emotional distress liability against a defendant physician who refused to release a patient's medical files for years))).

Here, Jeremiah alleges that Hartman, Sherman, and the four Doe correctional officers were aware of the frequent attacks at the prison, were aware that the two inmates who attacked Jeremiah were known to be dangerous, and that they failed to intervene during the attack. Jeremiah alleges sufficient facts that Hartman, Sherman, and the four Doe correctional officers' conduct constituted willful misconduct, as they allegedly watched two other inmates viciously assault Jeremiah, which resulted in his right eye being blinded, and intentionally chose to not intervene. With a more developed record, it is possible that a fact finder could find the alleged conduct to be outrageous.

Regarding Kovach and Smink, Jeremiah alleges that they were also aware that attacks frequently occurred at Northumberland County prison and chose not to remedy the situation.  Specifically, Jeremiah alleges that they deliberately implanted an inmate classification system that they knew resulted in inmate attacks.  As such, Kovach and Smink's conduct could be construed as willful misconduct, and thus, they would not be entitled to PSTCA immunity. Moreover, like Hartman, Sherman, and the four Doe correctional officers, a fact finder could find their alleged conduct to be outrageous.  Therefore, Jeremiah alleges sufficient facts to establish an intentional infliction of emotional distress claims against the defendants.  Accordingly, we recommend that Count IV of Jeremiah's second amended complaint not be dismissed.

### F. Conspiracy Claim.

In Count V of his second amended complaint, Jeremiah claims that Hartman, Sherman, the four Doe correctional officers, Kovach, and Smink conspired against him to violate his federal and state civil rights.  "The essence of a conspiracy is an agreement." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989).  "To demonstrate the existence of a conspiracy under § 1983, 'a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a

constitutional right under color of law.'" *LeBlanc v. Stedman*, 483 F.App'x. 666, 670 (3d Cir. 2012) (quoting *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003)).  "This requires that the state actors took 'concerted action' based on an 'agreement' to deprive the plaintiff of his constitutional rights, and that there was an actual underlying constitutional violation of the plaintiff's rights." *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020) (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018).

"It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-cv-1552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013).  Rather, the plaintiff must show that the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, No. 3:12-cv-1660, 2013 WL 5656125, at *5 (M.D. Pa. Oct. 15, 2013).

Because direct evidence of a conspiracy is rarely available, the existence of a conspiracy may be inferred from the circumstances. *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009).  Still, to state a conspiracy claim upon which relief can be granted, a plaintiff must allege "facts from which a conspiratorial agreement can be inferred." *Great Western Mining & Mineral Co. v.*

43

*Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010).  "To properly plead such an agreement, 'a bare assertion of conspiracy will not suffice.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

To properly plead or to survive a motion to dismiss, this court has held that "[t]he plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." *Flannagan v. Shively*, 783 F.Supp. 922, 928 (M.D. Pa. 1992).  Further, the "allegations must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each defendant allegedly played in carrying out those objectives." *Id.*

Here, Jeremiah has not alleged sufficient facts to establish a conspiracy claim against any of the defendants.  Jeremiah does not allege any facts that any of the defendants acted in concert together to violate his civil rights, nor does he allege facts that indicate the objectives of the conspiracy or the roles each defendant allegedly played.  Instead, Jeremiah merely claims that the defendants were aware of numerous inmate assaults occurring throughout the prison and that they had all seen videos of inmate assaults.   Jeremiah also claims that Kovach and Smink acted together to craft a policy that made reckless indifference to inmate assaults ubiquitous but alleges no further facts beyond that conclusion.  Indeed,

there is nothing in the second amended complaint from which a reasonable fact finder might infer that any of the defendants entered into a conspiracy to violate Jeremiah's civil rights.  Accordingly, because Jeremiah fails to allege sufficient facts to support a conspiracy claim against any of the defendants, we recommend dismissing Count V.

## VII.   Recommendations.

Based on the foregoing, we recommend denying the motion to dismiss (*doc. 34*) as it relates to Counts I and II.  For Count III, we recommend granting the motion to dismiss as it relates to defendants Kovach, Smink, and the Board; however, we recommend denying the motion to dismiss as it relates to the County. For Count IV, we recommend denying the motion dismiss.  For Count V, we recommend granting the motion to dismiss.  If this R&R is adopted, we recommend that the following claims survive:

Count I against Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers.

Count II against Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers.

Count III against the County.

45

Count IV against Kovach, Smink, Hartman, Sherman, and the four Doe correctional officers.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 28th day of February, 2022.


_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge